KAPILABEN C. PATEL,

         Plaintiff,    MEMORANDUM AND ORDER

    -against-        10-CV-1437 (JG)

MICHAEL J. ASTRUE, Commissioner
of Social Security,

         Defendant.
---------------------------------------------------------------x

A P P E A R A N C E S:

  BINDER & BINDER
    60 E. 42nd Street, Suite 520
    New York, NY 10165
  By: Jeannine LaPlace
    *Attorneys for Plaintiff*

  LORETTA E. LYNCH
    United States Attorney
    Eastern District of New York
    271 Cadman Plaza East
    Brooklyn, New York 11201
  By: Candace Scott Appleton
    *Attorney for Defendant*

JOHN GLEESON, United States District Judge:

    Kapilaben Patel seeks review, pursuant to 42 U.S.C. §§ 405(g) and 1383(c)(3), of the Commissioner of Social Security's denial of her application for a period of disability and disability insurance benefits. The parties have cross-moved for judgment on the pleadings. I heard oral argument on November 10, 2010. Because the Commissioner's decision is not supported by substantial evidence in the record, I deny the Commissioner's motion, grant Patel's motion, and remand for further proceedings.

BACKGROUND

This case arises from a 12-year-long series of denials and remands of Patel's claim for a period of disability and disability insurance benefits. On September 16, 1998, Patel filed the instant application for benefits,[1] alleging that she had been disabled since November 15, 1994 due to bilateral shoulder impairments and borderline intellectual functioning. (R. 753.) Her claim was initially denied on July 26, 2000, by Administrative Law Judge ("ALJ") Sol Wieselthier. On September 28, 2001, the Appeals Council vacated ALJ Wieselthier's opinion and remanded the case to him for reconsideration. ALJ Wieselthier issued a second adverse opinion on March 20, 2003, which was vacated and remanded by the Appeals Council on October 15, 2004. The case was transferred to ALJ Hazel Strauss, who on December 11, 2006 determined that Patel was not disabled because she retained the residual functional capacity to perform a limited range of light work, as defined in 20 C.F.R. § 416.967(b). (R. 32.) This opinion was vacated and remanded on August 25, 2007 by the Appeals Council due to a technical issue,[2] and ALJ Strauss issued a substantially similar opinion on June 20, 2008.[3] The Appeals Council denied Patel's latest request for review on February 19, 2010, making the ALJ's adverse decision the final decision of the Commissioner. *See DeChirico v. Callahan*, 134 F.3d 1177, 1179 (2d Cir. 1998).

A.   *The Plaintiff's Statements and Testimony*

Patel, a 62-year-old native Gujarati speaker, has a limited knowledge of English and an 11th-grade education. She worked as a sequin spooler from 1979 until 1994, but was laid

---

[1] Patel also filed a claim for benefits on April 5, 1996. Her claim was denied by ALJ Jacobs on October 28, 1997, and subsequently that denial became the final decision of the Commissioner. It appears Patel did not appeal the Commissioner's decision. (R. 18 n.1.)

[2] The Appeals Council was unable to procure a transcript of the hearing. Finding that the record was incomplete because of the missing transcript, the Appeals Council remanded for another hearing.

[3] The record available to ALJ Strauss at the second hearing was substantially identical to that available to her at the first hearing, and accordingly her second written opinion borrowed heavily from the language of her first opinion.

2

off on April 20, 1994. (R. 641.) While working as a sequin spooler, Patel used primarily her right arm to perform activities such as lifting spools weighing between ten and twenty pounds. (R. 23.) She alleges that this activity led to a repetitive stress injury to her right arm and shoulder. (*Id.*) She receives $100 per week in Workers' Compensation benefits arising from the injuries at issue in this case. (*Id.*)

Patel alleges that she has experienced disabling pain in her right and left shoulders since 1994, and specifically between November 15, 1994, her date of onset, and December 31, 1999, the date on which her insured status expired (the "period at issue"). She complains of burning pain, initially originating in her right shoulder, which spread to her left shoulder prior to the cessation of her insured period. (*See, e.g.*, R. 490.) She also complains of stiffness in her fingers and a substantially restricted range of motion in her shoulders. (R. 381.) She testified that she could not sit down for any length of time without moving her right arm. (R. 774.)

Due to her injuries, Patel alleges that she can no longer lift more than two or three pounds and cannot lift her arms over her head. (R. 776.) Because of these restrictions, she can no longer perform many of the activities of daily life, such as shopping, cooking, and personal grooming. (R. 773.) She also has difficulty sleeping and staying asleep due to the pain. (R. 786-87.) She has little social interaction, and cries frequently due to the stress of her situation. (R. 784.)

B.  *Medical Evidence*

   1.  *Treating Physicians*

On December 5, 1994, Patel visited the Union Health Center's occupational medicine clinic complaining of pain in her neck, right shoulder, and right arm, as well as weakness in her right hand and stiffness in her right and left middle fingers. She was initially

3

diagnosed with tendinitis in her right shoulder, right medial epicondylitis, and right middle finger arthritis, and she was referred to physical therapy. (R. 265, 387.)

Between 1995 and 1999 Patel was treated and examined by Dr. George Piligian, her treating physician, on a monthly to bi-monthly basis. At each appointment she complained of pain in her right shoulder and middle finger, decreased range of motion in her right shoulder, and various other symptoms in her right and left upper extremities. Piligian made consistent diagnoses based on examinations, tests, and Patel's reported symptoms. For example: on March 6, 1995, Piligian diagnosed Patel with bilateral digital tenosynovitis and right shoulder arthropathy. (R. 396.) An MRI taken the following week revealed a rotator cuff tear. (*Id.*) Piligian repeated the diagnosis of rotator cuff tear again on May 15, 1995 (R. 400), June 5, 1995 (R. 404), October 4, 1995 (R. 414), February 7, 1996 (R. 272), and again at similar intervals through the end of the insured period. He also diagnosed left rotator cuff tendinitis on June 5, 1995 (R. 404), left shoulder bicipital tenderness on March 27, 1996 (R. 284), and tenderness of the left shoulder, stiffness of the shoulder muscles, and right third digit ulnar deviation on May 14, 1997 (R. 318).

In a Medical Assessment of Ability to do Work-Related Activities completed on June 4, 1997, Piligian reported limitations in reaching, handling, pushing, and pulling due to an MRI finding of rotator cuff tear, and for the same reason reported that Patel could not perform repetitive or static postural motor tasks. (R. 240.) On November 19, 1997, Piligian conducted an examination that revealed pulling in the suprascapular muscles, again diagnosing right shoulder rotator cuff tear and left rotator cuff tendinopathy. (R. 346.) On February 11, 1998, he examined Patel and reported tenderness of the bicipital tendons bilaterally; he diagnosed bilateral shoulder tendinopathy and probable bilateral tenosynovitis. (*Id.*) He repeated that diagnosis at

4

approximately three-month intervals through August 18, 1999, when he added a diagnosis of right ulnar neuropathy and left rotator cuff impingement. (R. 468.) On September 2, 1998, he diagnosed early psoriatic arthritis of the right hand (a degenerative condition). (R. 362.) And on October 27, 1999, two months before Patel's insured status expired, he observed the unchanged status of her right shoulder and the noted "worsening" of the left shoulder. (R. 509.)

After the expiration of Patel's insured status, Dr. Piligian continued to examine, diagnose, and treat the plaintiff for most of the next ten years. His diagnoses of right rotator cuff tear, right ulnar neuropathy, and left rotator cuff impingement were unchanged throughout this period. (*See, e.g.*, R. 510, 516, 566-67, 579.)

From 2002 to 2005 Patel was seen on a regular basis by Dr. Chow Ng, a colleague of Dr. Piligian. On July 1, 2002, Dr. Ng's examination revealed tenderness with palpation in Patel's right shoulder and forearm, positive Hawkin and Neer tests, tenderness with range of motion in both shoulders, mild to moderate weakness of the right shoulder, elbow, and wrist, and mild weakness of the left shoulder. Based on his observations he diagnosed right rotator cuff and bicipital tendinitis with history of rotator cuff tear and right ulnar neuropathy. (R. 473.) Ng repeated those diagnoses on March 31, 2003, adding a pain rating of five to six on a ten-point scale (R. 536-37), and again in various notes written throughout 2004 and 2005. (R. 678-684.)

2. *Other Medical Opinions*

On November 10, 1998, in relation to Patel's application for benefits, Dr. Kyung Seo, a Social Security Administration consultative examiner, examined Patel. Seo observed that Patel was in visible pain from her shoulder or arm such that she had to move frequently, and noted her "insist[ence]" that both arms suffered from diminished sensation. He found that Patel's range of motion, reflexes, and fine motor coordination were "essentially normal." He diagnosed

5

right shoulder myofascial pain due to repetitive stress syndrome. He concluded that Patel had difficulty holding, lifting, and carrying heavy objects "due to aching pain and burning pain with limitation of range of motion," but could lift and carry approximately 15 pounds. He also concluded she was able to sit, stand, or walk "without much difficulty." (R. 244-45.)

A residual functional capacity questionnaire was completed by Dr. Sury Putcha in preparation for Patel's first hearing. Putcha diagnosed right shoulder impingement syndrome with pain and limited abduction. (R. 251.) He stated that Patel could lift 20 pounds occasionally and 10 pounds frequently, could stand, sit, or walk for approximately six hours per day, and had upper body limitations that restricted her ability to push and pull. (R. 254.) Putcha did not himself examine Patel; it appears from Putcha's report that his conclusions were largely or entirely based upon the observations of Dr. Seo, and not on those of Dr. Piligian. (*See, e.g.*, R. 254, 256.)

During the period at issue, Patel was examined several times by Dr. Robert Zaretsky in connection with an ongoing claim for benefits from the Workers' Compensation Board ("WCB"). On April 18, 2007, Zaretsky observed "noted positive impingement signs" in Patel's right shoulder and diagnosed a "mild partial disability," but wrote that her abduction, flexion, and other rotations were normal. (R. 600.) On September 24, 1998, he again noted that her range of motion was normal, but she had a mild defect in right shoulder flexion and mild impingement signs in the same shoulder. (R. 639.) Zaretsky examined Patel again on September 2, 1999, finding reduced range of motion and mild positive and secondary impingement signs. He opined that she had a ten percent loss of use of the right arm. (R. 646.)

Dr. Thomas Weiss testified at the 2003 hearing held by ALJ Wieselthier. He stated that although the medical evidence indicated a right rotator cuff tear and right ulnar

6

neuropathy, he could not discern a basis for the diagnosis of right ulnar neuropathy (R. 859), or for a restriction on sitting, standing, walking, kneeling, squatting, or climbing (R. 860). He stated that Patel could lift ten pounds frequently and twenty occasionally, and opined that she had no contraindication for using her hands for "skilled" work. (R. 861.) He observed that she would have difficulty reaching with her right arm and performing repetitive work if her arms were not supported. (R. 861-62, 866-69.) Weiss was the only medical expert to testify in any hearing before an ALJ in this case; ALJ Strauss did not solicit the opinion of a medical expert. (*See* R. 17-35.)

C.     *Vocational Evidence*

Pat Green, the vocational expert who testified in the second hearing before ALJ Strauss, was provided several hypothetical examples of individuals based on various doctors' opinions. For each hypothetical she was asked to describe the level of work, if any, that the hypothetical individual could perform if she were restricted to simple, unskilled work because "she may have borderline intellectual functioning." (R. 797.) Given a hypothetical individual with the characteristics described by Drs. Seo and Putcha, including the ability to lift 10 pounds frequently and 20 pounds occasionally, with no limitation on time spent sitting, standing, or walking, Green testified that such an individual would be qualified to do certain specific jobs classified as light work. (R. 799.) When asked whether an individual with the restrictions described by Dr. Piligian (including substantial restrictions on grasping or twisting objects and on fine manipulation but having no limitation on sitting, standing, or walking) could perform light work, Green stated that she could not. (R. 807.) Green also testified that if the individual were to miss more than three days per month due to injury (R. 808) or could not lift more than two or three pounds (R. 822), she would be unable to do any work at all. If ALJ Strauss had

7

credited Piligian's findings rather than Putcha's and Seo's, Green's opinion would have necessitated a finding that Patel was disabled.[4]

DISCUSSION

A.  *The Standard of Review*

To be found eligible for disability benefits, Patel must show that, "by reason of any medically determined physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months," 42 U.S.C. § 423(d)(1)(A), she "is not only unable to do [her] previous work but cannot, considering [her] age, education, and work experience, engage in any other kind of substantial gainful work which exists in the national economy," *id.* § 423(d)(2)(A).[5] On review, the question presented is whether the Commissioner's decision to deny benefits is supported by substantial evidence in the record. *See* 42 U.S.C. § 405(g); *Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004) (*per curiam*). In deciding whether the Commissioner's conclusions are supported by substantial evidence, a reviewing court must "first satisfy [itself] that the claimant has had 'a full hearing under the [Commissioner's] regulations and in accordance with the beneficent purpose of the Act.'" *Echevarria v. Sec'y of Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982) (quoting *Gold v. Sec'y of Health, Educ. & Welfare*, 463 F.2d 38, 43 (2d Cir. 1972)).

The Social Security regulations direct a five-step analysis for evaluating disability claims:

---

4   Because Patel is a person of advanced age, a restriction to sedentary work would require the Commissioner to determine that she is disabled and entitled to benefits. (*See* R. 761-62.)

5   Work may be substantial even if it is not full-time or if it generates less income or carries less responsibility than previous employment. 20 C.F.R. § 404.1572. Work is gainful "if it is the kind of work usually done for pay or profit, whether or not profit is realized." *Id.* Activities such as household tasks, hobbies, therapy, school attendance, club activities, or social programs are generally not considered to be substantial gainful activity. *Id.*

8

> First, the [Commissioner] considers whether the claimant is currently engaged in substantial gainful activity. If he is not, the [Commissioner] next considers whether the claimant has a "severe impairment" which significantly limits his physical or mental ability to do basic work activities. If the claimant suffers such an impairment, the third inquiry is whether, based solely on medical evidence, the claimant has an impairment which is listed in Appendix 1 of the regulations. If the claimant has such an impairment, the [Commissioner] will consider him disabled without considering vocational factors such as age, education, and work experience; the [Commissioner] presumes that a claimant who is afflicted with a "listed" impairment is unable to perform substantial gainful activity. Assuming the claimant does not have a listed impairment, the fourth inquiry is whether, despite the claimant's severe impairment, he has the residual functional capacity to perform past work. Finally, if the claimant is unable to perform his past work, the [Commissioner] then determines whether there is other work which the claimant could perform."

*DeChirico*, 134 F.3d at 1179-80 (2d Cir. 1998) (internal quotation marks omitted); *see also* 20 C.F.R. § 404.1520. The claimant bears the burden of proof in the first four steps, the Commissioner in the last. *See Green-Younger v. Barnhart*, 335 F.3d 99, 106 (2d Cir. 2003).

B.    *Analysis*

The ALJ followed the five-step procedure outlined above. First, she determined that Patel had not engaged in substantial gainful activity since November 15, 1994, and that she met the insured status requirements set out by the Social Security Act through December 31, 1999. (R. 20.) Second, she determined that Patel had a "severe impairment[]" of the "right dominant upper extremity (shoulder) . . . due to right rotator cuff tear." (*Id.*) She also found that Patel had possible borderline intellectual functioning, which she classified as a severe impairment. (R. 21.) She did not determine that Patel's left shoulder had sustained a severe impairment. (R. 20.) Third, she determined that Patel's severe impairments did not meet or

medically equal any impairments listed in 20 C.F.R. § 404 subpt. P. app. 1. (R. 22.)[6] Fourth, the ALJ determined that Patel lacked the residual functional capacity to perform the duties of her previous position, that of a sequin spooler. (*Id.*) Fifth, the ALJ concluded that Patel was not disabled under the Social Security Act because she retained the residual functional capacity to perform a subset of the statutory range of "light work." (R. 23-24.) *See* 20 C.F.R. § 416.967(b) ("Light work involves lifting no more than 20 pounds at a time with frequent lifting or carrying of objects weighing up to 10 pounds. Even though the weight lifted may be very little, a job is in this category when it requires a good deal of walking or standing, or when it involves sitting most of the time with some pushing and pulling of arm or leg controls.").[7] She also found that Patel's severe mental impairment left her with the "mental residual functional capacity [only] for simple work."[8]

    1.    *Procedural Flaws in the ALJ's Decision*

        a.   *Failure to Observe the Treating Physician Rule*

Under the Social Security regulations, a treating physician's opinion about a claimant's impairments is entitled to "controlling weight" if it is "well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2); *see also Schisler v. Sullivan*, 3 F.3d 563, 568 (2d Cir. 1993) (upholding these regulations). The Commissioner must set forth "good reasons" for refusing to accord the opinions of a treating physician controlling

---

[6] Although at the third step of her inquiry ALJ Strauss held that Patel's severe impairments did not meet or medically equal any impairment listed in 20 C.F.R. § 404 subpt. P. app. 1, she failed to support her holding with any evidence or reasoning. (R. 22.) On remand, the Commissioner is respectfully directed to ensure that the determination at Step 3 is supported by a written finding.

[7] The statute goes on to clarify that "[i]f someone can do light work, we determine that he or she can also do sedentary work, unless there are additional limiting factors such as loss of fine dexterity or inability to sit for long periods of time." *Id.*

[8] ALJ Strauss's determination that Patel can perform only simple work due to her severe mental impairment is uncontested. (Opp. at 2 n.6.)

10

weight. He must also give "good reasons" for the weight actually given to those opinions if they are not considered controlling. 20 C.F.R. § 404.1527(d)(2); *see Halloran v. Barnhart*, 362 F.3d 28, 33 (2d Cir. 2004) ("We do not hesitate to remand when the Commissioner has not provided 'good reasons' for the weight given to a treating physician[']s opinion and we will continue remanding when we encounter opinions from ALJs that do not comprehensively set forth reasons for the weight assigned to a treating physician's opinion."); *Snell v. Apfel*, 177 F.3d 128, 133 (2d Cir. 1999) ("Under the applicable regulations, the Social Security Administration is required to explain the weight it gives to the opinions of a treating physician."). When the Commissioner does not give a treating physician's opinion controlling weight, the weight given to that opinion must be determined by reference to: "(i) the frequency of examination and the length, nature, and extent of the treatment relationship; (ii) the evidence in support of the opinion; (iii) the opinion's consistency with the record as a whole; (iv) whether the opinion is from a specialist; and (v) other relevant factors." *Schaal*, 134 F.3d at 503 (citing 20 C.F.R. § 416.927(d)(2)).

ALJ Strauss failed to correctly apply the treating physician rule. Patel's treating physician, Dr. Piligian, emphatically and consistently maintained that Patel was fully disabled from any work,[9] and supported his opinion with extensive medical observations and tests. But in each paragraph where ALJ Strauss discussed Piligian's clinical conclusions and evaluations of Patel's residual functional capacity, she disregarded his opinions for insufficient reasons. (R. 27-28, 31.) For example, ALJ Strauss disregarded Piligian's assessment of a three-pound limitation on lifting and carrying because it was coupled with a mention of Patel's "sparse muscle mass" and "small body frame," and because Piligian included no medical evidence demonstrating a left

---

[9] These conclusions often came in the form of written medical opinions for the WCB. (*See, e.g.*, R. 243, 335, 580, 631, 650.) Although the WCB has a different standard of proof for disability than does the Social Security Administration, as noted by ALJ Strauss (R. 28), the underlying medical conclusions must still be given the appropriate weight.

11

extremity impairment. (R. 27, *see* R. 240.) But Piligian included this discussion as a secondary reason for the restriction[10] -- his primary reason being Patel's "weakness in both upper extremities with early right hand numbness." (R. 240.)[11] Indeed, it appears to me that this weight restriction alone, diagnosed by Patel's treating physician well within the period at issue, should have been given controlling weight. Given the testimony of the vocational expert, on remand it may require a finding of disability.[12]

In discounting Dr. Piligian's opinions in such a cursory way, ALJ Strauss failed to follow the rules set out by 20 C.F.R. § 404.1527(d). Prior to assigning Piligian's diagnoses anything other than controlling weight, the ALJ was obligated to discuss, among other factors, the number of examinations and type of treatment the doctor provided. *See Schaal*, 134 F.3d at 503. She focused in depth only on three specific examinations or reports, but during the four years between the onset date and the expiration of Patel's insured status alone, Piligian saw Patel over 15 times. The ALJ explained away as "uncorroborated by objective testing" a handful of the diagnoses (including one in which there was an MRI (R. 28)) and ignored the rest. (R. 30.) ALJ Strauss should have discussed, or at least acknowledged, each of the occasions on which Piligian evaluated and diagnosed Patel. When an ALJ fails to adequately consider the factors required by the regulations, there is "reasonable basis for doubt [as to] whether the ALJ applied correct legal principles." *Schaal*, 134 F.3d at 504. Such doubt necessitates a remand.

---

10      In answer to the question of what medical findings supported Dr. Piligian's weight limitation assessment, he wrote: "Weakness in both upper extremities with early right hand numbness precludes lifting or carrying tasks > 3 lbs. Pt is also of a small body frame with sparse muscle mass 108 lbs." (R. 240.) This language shows that Piligian found the weight limitation based upon objective medical evidence.

11      Similarly, ALJ Strauss noted that because Piligian "includes both shoulders in his functional capacity assessment" but put forward "a clinical and diagnostic test for diagnosis of the right shoulder only," his "statements are not credible and his assessment is given very little weight." (R. 28.) But she failed to discuss Piligian's comments on Patel's right shoulder, which, as noted above, would likely have given rise to a finding of disability, even though she observed that Piligian had provided a "clinical" diagnosis of the right shoulder.

12      Referencing this same report by Dr. Piligian, Green, the vocational expert, testified that "if the individual was limited to lifting a maximum of three pounds she could not do any work." (R. 34.)

12

Moreover, Dr. Piligian did in fact make several diagnoses related to Patel's left shoulder that should have been considered. For example: on March 6, 1995, he diagnosed bilateral digital tenosynovitis (R. 396); on June 5, 1995, he diagnosed left rotator cuff tendinitis (R. 404); on March 27, 1996, he diagnosed left bicipital tenderness (R. 284); on August 14, 1996, he diagnosed probable left rotator cuff impingement and requested an MRI (R. 297); and on October 13, 1996, he diagnosed a questionable left rotator cuff tear (R. 300). (*See also* R. 755 (setting out documented instances of left shoulder impairment).) The record also indicates that Piligian attempted several times to receive authorization from the WCB for a left shoulder MRI (*see, e.g.*, R. 624), the last of which was made on October 27, 1999 (R. 509), but when Patel's insured status ran out on December 31, 1999, the WCB was apparently still unresponsive. (R. 510.) In sum, Dr. Piligian's records include numerous references to left shoulder impairments. He wanted an MRI performed on the left shoulder, but the MRI request was not approved. In those circumstances, it is not fair to deny benefits because "the record fails to establish objectively that the claimant has a left shoulder . . . impairment." (R. 28.)

Where, as here, I "cannot say with certainty what weight should be assigned . . . to the opinion of the plaintiff's treating physician," and where "further clarification of the record . . . might alter the weighing of the evidence," the ALJ's decision is fatally flawed. *Schaal*, 134 F.3d at 504. Because ALJ Strauss nowhere interacts substantively with Dr. Piligian's findings regarding Patel's right shoulder -- the shoulder ALJ Strauss deemed to have a severe impairment -- choosing instead to discredit Piligian's entire record based on his opinions regarding Patel's left shoulder, I must remand for an evaluation of the appropriate weight to be given Piligian's evaluation of Patel's right shoulder and overall physical limitations, particularly in combination with a mental impairment the ALJ described as "severe." (R. 21.) On remand the ALJ should

reevaluate Piligian's views regarding Patel's left shoulder given his extensive documentation of Patel's bilateral pain symptoms, and if necessary and feasible should seek to develop the record as to the extent of Patel's left shoulder injury during the period at issue.

### b. *Failure to Develop the Record*

An ALJ conducting an administrative hearing has an affirmative duty to investigate facts and develop the record where necessary to adequately assess the basis for granting or denying benefits. *See* 20 C.F.R. § 416.1400(b) (expressly providing that the Social Security Administration "conduct the administrative review process in an informal, nonadversary manner"); *Sims v. Apfel*, 530 U.S. 103, 110-11 (2000) ("Social Security proceedings are inquisitorial rather than adversarial. It is the ALJ's duty to investigate the facts and develop the arguments both for and against granting benefits . . . ."); *Shaw v. Chater*, 221 F.3d 126, 134 (2d Cir. 2000).

I conclude that the ALJ failed to fulfill this duty with respect to Dr. Ng. Ng's opinion was accorded no weight at all by the ALJ, and the reasons were insufficient. First, because Ng told Patel's lawyers that they would need to contact the doctors who had seen her during the period at issue, that is, before December 31, 1999, the ALJ concluded that Ng himself did not treat her. (R. 29.) That strikes me as a *non sequitur*, but at the very least, given the importance of a treating physician's evaluation in the regulatory scheme, the ALJ should have asked Ng whether he treated Patel during the period at issue.

Second, the ALJ placed too much weight on the fact that Dr. Ng did not first see Patel until September 19, 2001, 21 months after the end of the period at issue. The ALJ concluded that the delay warranted giving Ng's opinion "no weight" because it did "not relate back to [the] claimant's medical status in the relevant period." (*Id.*) That was wrong. "The coincidence of a treating source's evaluation and treatment with the claim for SSDI benefits is

not determinative; accordingly, 'a treating physician's retrospective medical assessment of a patient may be probative.'" *Valerio v. Comm'r of Soc. Sec.*, 2009 WL 2424211, at *11 (E.D.N.Y. 2009) (Sifton, J.) (quoting *Perez v. Chater*, 77 F.3d 41, 48 (2d Cir. 1996)). The timing of Ng's evaluation and treatment of Patel may bear on the weight to be accorded his opinions, but the Commissioner may not reject medical evidence simply because it includes retrospective assessments of a claimant's medical condition or functional capacity. Instead of rejecting Ng's views out of hand, the ALJ should have welcomed them and considered them to the extent they shed useful light on Patel's ability to work during the period at issue.

Finally, the ALJ expressed concern regarding Dr. Ng's statement on a questionnaire that Patel's first treatment was in 1996, while the records from the Union Health Center reveal that Ng himself did not see her until years later. But Ng was clear that the 1996 date referred to Patel's treatment by other doctors at the Union Health Center, and he specified precisely (at R. 543) which doctors saw her on which dates. Contrary to the suggestion in the ALJ's opinion, there was nothing untoward about Ng's statement in the questionnaire that Patel's first treatment was in 1996. On remand, the assigned ALJ should ascertain whether Ng was a treating physician. If he was, he should be invited to supplement the record and the treating physician rule should be rigorously applied to his opinions.

## CONCLUSION

The Commissioner's motion for judgment on the pleadings is denied, Patel's is granted, and the case is remanded to the Commission for further proceedings consistent with this opinion.

        So ordered.

        John Gleeson, U.S.D.J.

Dated: December 10, 2010
      Brooklyn, New York